In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――

Nos. 06-2901 & 06-3252

ERIC JOELNER, FISH, INC. D/B/A
XXXTREME ENTERTAINMENT, FREE SPEECH,
INC., AND FIRST AMENDMENT, INC.,

*Plaintiffs-Appellees,*

*v.*

THE VILLAGE OF WASHINGTON PARK, ILLINOIS,

*Defendant-Appellant.*

―――――――

Appeals from the United States District Court
for the Southern District of Illinois.
No. 03 C 325—**G. Patrick Murphy**, *Judge.*

―――――――

ARGUED OCTOBER 3, 2007—DECIDED NOVEMBER 19, 2007

―――――――

Before COFFEY, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* In this successive appeal, the Village of Washington Park ("the Village") challenges the district court's ruling that an ordinance prospectively banning alcohol in strip clubs opened in the future, but permanently exempting existing clubs from the ban, was unconstitutional. We previously determined that the Village's earlier restriction on the number of such clubs was "most likely" unconstitutional because it appeared to be "predominantly motivated by concerns about revenue

and/or political patronage." Because the district court did not clearly err in finding that the Village passed the new ordinance for this same impermissible purpose, we affirm.

The Village's economy is dependent on adult entertainment. As our previous opinion, *Joelner v. Village of Washington Park*, 378 F.3d 613, 616 (7th Cir. 2004) ("*Joelner I*"), sets forth in more detail, the Village derives almost 100% of its income from the adult entertainment industry, a situation that the tiny Village has admitted it is doing little to remedy. *See* John McCormick, Cash-strapped Town Relies on Strip Clubs to Pay Bills, Chi. Trib., Apr. 29, 2003, at A1. As of June 2006, the Village licensed eight adult cabarets in its surrounding 2.5 mile span, including two cabarets under new construction.

The present dispute originated in early 2003 when Joelner first applied for licenses to operate adult cabarets. At that time a Village ordinance limited cabaret licenses to four, all of which were already issued. In 2003 the Village passed Ordinance 01-27, which increased the number of available licenses to six. The amended ordinance stated that the Village maintained a limit "in order to promote the public interest in the preservation of public health, safety and welfare . . . ," but contained no other statement of purpose. The Village then immediately granted the two newly available licenses. It granted one to the son of the Village's former police chief even though he, unlike Joelner, did not have an application pending on the Village Board's agenda, and gave the second to an individual who applied for a license after Joelner. The Board then denied Joelner's application.

Joelner sought a preliminary injunction to force the Village to grant him adult cabaret licenses, which the district court denied. We, after balancing the equities, affirmed the denial. *See Joelner I*, 378 F.3d at 627. But we did conclude that the numerical restriction on licenses

in Ordinance 01-27 was most likely unconstitutional on its face because it "seemed to be predominantly motivated by concerns about revenue and/or political patronage . . . ." *Id.* at 624. In reaching this conclusion, we observed that the record did not indicate that the Village relied on any studies or findings regarding the secondary effects associated with the adult entertainment industry when it enacted 01-27. *Id.* We opined that if the Village could not produce such evidence on remand, strict scrutiny would apply and the ordinance would "most likely" be struck down. *Id.* at 624-25.

Shortly after that opinion issued, the Village repealed Ordinance 01-27 and replaced it in April 2005 with Ordinance 01-63, the ordinance at issue in this appeal. It lifts the numerical limit on licenses for adult entertainment venues. The final version of the ordinance was also amended to expand the permissible hours of operation after dark, mandating only that such establishments close in the morning between 6:00 a.m. and 11:00 a.m. It was further amended to allow partial nudity and on-site masturbation but forbids both patrons and employees from appearing in "a state of complete nudity." Most notably for purposes of this appeal, the ordinance bans the sale or consumption of alcohol on site except in "entities licensed as adult cabarets under prior Village ordinances."

Additionally, in contrast to 01-27's terse statement of purpose, 01-63 contains both a separate preamble and findings. They assert that the ordinance aims "to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the Village." The ordinance does not cite directly to any studies of these secondary effects; instead it explains that the Village Board relied upon "findings and narrowing constructions" in 19 listed federal court opinions. Some of these opinions refer to the harmful

effects of combining alcohol with adult entertainment. But none claims that allowing alcohol sales to continue at the already-operating venues and banning it only from future clubs ameliorates the harm from combining alcohol with nude dancing.

At a bench trial Joelner claimed that the purpose of the prospective alcohol ban in Ordinance 01-63 is to favor the Village's political patrons—owners of currently licensed cabarets. Joelner emphasized that he could not compete if his cabarets could not, like the others, serve alcohol. He further testified that despite the enactment of 01-63, all the adult cabarets in the Village continue to feature complete nudity, and at least one operates 24 hours. He also submitted into evidence adult entertainment and liquor licenses for two cabarets not yet in existence at the time of trial that covered back prior to Ordinance 01-63's enactment. And finally, Joelner recounted that when Ordinance 01-63 was enacted he promptly applied for a cabaret license, but the mayor denied him the license ostensibly because he had not appeared before the Board. As Joelner explained, Ordinance 01-63 contains no such requirement and instead provides that the Village clerk shall immediately issue a temporary license upon receipt of a completed application.

The Village mayor then briefly testified for the Village. He asserted that the Village exempted current license holders from the alcohol ban because the Board was concerned about infringing upon their property rights. The mayor did not otherwise address Joelner's testimony.

After considering the ordinance and the testimony, the district court struck down the alcohol ban in Ordinance 01-63 as unconstitutional on its face. It also ruled that the denial of cabaret licenses to Joelner under 01-63 was unconstitutional. The district court explained

that the Village produced "no evidence" at trial that it enacted Ordinance 01-63 to combat the deleterious effects of combining alcohol and adult entertainment. The court reasoned, no matter what level of scrutiny it applied, the alcohol ban would be unconstitutional because it is designed only to prevent Joelner from reaching "his competitor's profits." The court ordered the Village to grant Joelner cabaret licenses and allow him to conduct business as do the other cabarets in the Village. Finally, the court awarded $66,077 in attorneys' fees to Joelner under 42 U.S.C. § 1988 because he was the "prevailing party."

On appeal the Village challenges the district court's factual finding that the alcohol ban was adopted to stifle competition with current license holders. The Village insists that the ban was meant to curb the "secondary effects" of adult entertainment. This factual finding, which we accepts unless clearly erroneous, *Entertainment Software Assoc. v. Blagojevich*, 469 F.3d 641, 644 (7th Cir. 2006), was critical. It determined the applicable legal standard, which we review *de novo*. *See id.*; *Andy's Restaurant & Lounge, Inc. v. City of Gary*, 486 F.3d 550, 554 (7th Cir. 2006).

The applicable legal standard comes from the "44 Liquormart roadmap."[1] Under that roadmap, a reviewing court proceeds in two stages. First it must ask if an ordinance that bans alcohol at adult entertainment establishments (1) is passed pursuant to a legitimate governmental power, (2) does not completely prohibit

---

[1] The "roadmap" is derived from *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996). It is a confluence of the tests formulated by the Supreme Court for analyzing adult entertainment zoning ordinances and public indecency statutes. *See Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 713-22 (7th Cir. 2003) (discussing cases).

adult entertainment, and (3) is aimed at combating the negative secondary effects caused by adult entertainment establishments. *See Ben's Bar*, 311 F.3d at 722. If so, then the regulation is constitutional if it survives intermediate scrutiny, meaning it serves a substantial governmental interest, it is narrowly tailored, and reasonable alternative avenues of communication remain available. *See generally id.*, 316 F.3d at 722. If, on the other hand, a regulation is not aimed at secondary effects (it fails step three), strict scrutiny applies. *See Joelner I*, 378 F.3d at 622-23; *Illusions-Dallas Private Club, Inc. v. Steen*, 482 F.3d 299, 308 (5th Cir. 2007). This means that the regulation must "be necessary to achieve a compelling state interest and be narrowly drawn to achieve that end." *Joelner I*, 378 F.3d at 622-23. Because the level of scrutiny is at stake, we first address whether the district court's factual finding of anti-competitive purpose was clear error.

The Village, which bears the burden at step three of the roadmap, had to demonstrate that its "predominant concerns" motivating the ban were with secondary effects. *Andy's Restaurant*, 486 F.3d at 554. Courts may consider, among other materials, the text of the ordinance, its preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware. *See R.V.S. v. City of Rockford*, 361 F.3d 402, 409 n.5 (7th Cir. 2004); *Ben's Bar*, 316 F.3d at 723 n.28. Although a municipality's burden is lax—it need not always produce independent evidence—its position still "must appear reasonable." *Joelner I*, 378 F.3d at 624 n.7; *Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1283-84 (11th Cir. 2001).

The district court did not err in finding that the Village enacted Ordinance 01-63, exempting existing operators from the alcohol ban, to protect those operators from competition with Joelner. Joelner testified without contra-

diction that he has been the sole applicant for a license under the new ordinance. Without dispute he explained that it is impossible to sustain an adult cabaret in the Village's present environment (consisting of other, alcohol-dispensing venues) without also serving alcohol. It was perfectly reasonable for the district court to infer that potential customers for Joelner—and the secondary effects associated with them—would just migrate to the establishments exempted from the alcohol ban rather than go away. As the Supreme Court has emphasized, "[e]xemptions from an otherwise legitimate regulation of a medium of speech may . . . diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994).

The Village argues that a city should be permitted to experiment with gradual solutions to its problems. While this is true, *see Young v. American Mini Theaters,* 427 U.S. 50, 71 (1976), we, like the district court, see no evidence that this was the Village's reason for banning alcohol only prospectively. The mayor admitted that virtually all the Village's income is still derived from adult cabarets. From this the district court reasonably derived that the Village has little incentive to cure its "ills." In fact, the Village backdated licenses to ensure that clubs not yet in operation when 01-63 was enacted could serve alcohol. And several additional aspects of Ordinance 01-63 belie the Village's purported desire to combat secondary effects from adult entertainment. For instance, the mayor specifically amended the ordinance to expand the permissible hours of operation for adult cabarets, by allowing them to stay open all night, and thereby seemingly increased the likelihood of crime, prostitution, and several of the other secondary effects identified in the ordinance. Furthermore, the Village has neglected to enforce most of the other restrictions in the ordinance, such as the prohibition on complete nudity, against current license holders. The

backdated licenses, the expanded hours of operation, and the unenforced prohibition on complete nudity permitted the district court to conclude without clear error that the Village was not experimenting with a gradual solution to the secondary effects of erotic speech.

To support its claim that it enacted the prospective alcohol ban to curb secondary effects, the Village relies, as it did at trial, solely on Ordinance 01-63's preamble and findings. The Village likens this case to *Ben's Bar, Inc., v. Village of Somerset*, 316 F.3d 702, 704 (7th Cir. 2003), which involved an ordinance that banned alcohol in all adult entertainment establishments featuring nude dancing. The preamble there cited several findings made by other municipalities about the negative effects of the combination. *See id.* at 705. We ruled that the preamble sufficiently demonstrated that the ordinance was passed to combat secondary effects. *See id.* at 723-25.

The Village concedes that its ordinance contains no citations to similar findings, but argues that the citation to *Ben's Bar* itself among the 19 cases cited in the ordinance is akin to citing directly to the studies themselves. But this case differs markedly from *Ben's Bar*. First, in that case the opponent of the ordinance introduced no evidence of a counter motive, such as anti-competition. *See Ben's Bar*, 316 F.3d at 726. Second, none of the studies in *Ben's Bar* suggested that banning alcohol at only one of many nude dancing clubs diminishes their secondary effects. *See id.* at 705.

Because the purpose of the ban on alcohol consumption in newly licensed establishments was to prevent competition, strict scrutiny applies. And based on its anti-competitive purpose, the ban is not "necessary to serve a compelling state interest and narrowly drawn to that end." *See Joelner I*, 378 F.3d at 624. We therefore conclude that the alcohol ban and the licensing scheme as a whole (from

which the alcohol ban is not severable) are unconstitutional on their face.

We add that even if the Village were indeed attempting to combat secondary effects with its alcohol ban, and intermediate scrutiny thus applied, the Ordinance could not survive. The Village again relies on *Ben's Bar* and argues that because we there determined that a ban on alcohol in both newly and currently licensed adult entertainment establishments passed muster under intermediate scrutiny, *see Ben's Bar*, 316 F.3d at 726-28, Ordinance 01-63's ban on alcohol in only newly licensed establishments can not possibly be considered less narrowly tailored.

But the Village's reasoning is flawed. The Supreme Court has repeatedly recognized that an underinclusive regulatory scheme is not narrowly tailored. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (concluding that "exemptions and inconsistencies bring into question the purpose of the labeling ban . . . [and] ensure[ ] that the labeling ban will fail to achieve that end"); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425 (1993) (determining that an ordinance was unconstitutional when, among other reasons, "the city has asserted an interest in esthetics, but respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain on [the city's] sidewalks"). Here, there is similar underinclusiveness that would be fatal to the intermediate scrutiny-narrow tailoring analysis: the ordinance *permanently* insulates eight concentrated establishments from the alcohol ban and leaves alcohol use at those establishments otherwise *entirely* unrestricted. In fact, in *Ben's Bar* we observed that "as a practical matter, a complete ban of alcohol on the premises of adult entertainment establishments is the *only* way the Village can advance that interest." *Ben's Bar*, 316 F.3d at 728 (emphasis in original).

Finally, there remains the district court's rulings that it was unconstitutional to deny Joelner cabaret licenses and to award attorneys' fees to Joelner. The Village does not challenge the district court's ruling as to the denial of the licenses—which indeed appears arbitrary—so any such challenge is waived. *See Ajayi v. Aramark Bus. Servs., Inc.,* 336 F.3d 520, 529 (7th Cir. 2003). And although the Village does request that we reverse the award of attorneys' fees, it bases this request solely on its contention that Joelner should not have been the "prevailing party," *see* 42 U.S.C. § 1988; *Gautreaux v. Chicago Housing Authority*, 491 F.3d 649, 655 (7th Cir. 2007). Thus any challenge to the reasonableness of the fees is also waived.

For the foregoing reasons, we AFFIRM the judgment of the district court striking down Ordinance 01-63 as unconstitutional on its face and ordering the Village to award Joelner adult cabaret licenses. We also AFFIRM the district court's award of attorneys' fees.

A true Copy:

　　　　Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*